IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| HAROLD MATHENEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2:08-cv-0066 |
| ) | Judge Trauger |
| CITY OF COOKEVILLE, TENNESSEE; ) | |
| ROBERT TERRY, individually and in his ) | |
| official capacity as Chief of Police of the City ) | |
| of Cookeville Police Department; ) | |
| CHASE MATHIS, ANTHONY REEP, ) | |
| JOSH WARD, JOHN DOE 1, and ) | |
| JOHN DOE 2, individually and in their ) | |
| official capacity as Police Officers of the City ) | |
| of Cookeville, Tennessee Police Department, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM

Pending before the court is the Motion for Summary Judgment filed by defendants City of Cookeville and Robert Terry (Docket No. 36), the Motion for Summary Judgment filed by defendants Chase Mathis, Anthony Reep, and Josh Ward (Docket No. 53), the plaintiff's responses (Docket Nos. 61 and 70), and the defendants' replies (Docket Nos. 67 and 71). For the reasons discussed below, the defendants' motions will be granted.

## FACTS

Plaintiff Harold Matheney is suing the defendants for their alleged use of excessive force when arresting him. On the night of July 17, 2007, the Cookeville Police Department ("CPD") received a call reporting suspicious activity by the occupants of a pickup truck driven by

1

Matheney.[1] When officers responded to the call, Matheney's companions ran from the truck. Matheney, who had drunk "a few" beers and was driving without a license, did not run. (*See* Docket No. 36, Ex. 11 at 147-48.) Instead, to escape the police, he drove the truck out of the trailer park he was in, across an open field, down a dirt road, and onto a nearby street.

At that point, CPD Officer Chase Mathis saw the plaintiff and began pursuing him. Matheney proceeded to lead police officers and sheriff's deputies on a seven-mile car chase through rural Putnam County. Matheney ultimately arrived at a junkyard where he had previously lived. With the officers trailing close behind, he crashed the truck, fled on foot, and attempted to hide behind a vehicle in the junkyard.

It was after 10:00 pm, and the junkyard had no lights. Mathis, who is a K-9 officer, claims that he shouted a warning that, if Matheney did not surrender, he would deploy his police dog, "Melo." Matheney testified that he did not hear any warning over the sirens. In any event, Mathis released Melo, and the dog quickly found Matheney and apprehended him by biting his left leg. Mathis, with other officers trailing behind him, followed the dog to Matheney's hiding place.

The parties differ in their accounts of what happened next. According to the defendants, Matheney was fighting the police dog when the officers arrived. Mathis testified that Matheney

---

[1] Unless otherwise noted, the facts are drawn from the defendants' statements of undisputed facts (Docket Nos. 37 and 55), the plaintiff's responses (Docket Nos. 63 and 68), and related exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, the court draws all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Brown v. United States*, 583 F.3d 916, 919 (6th Cir. 2009).

"was grabbing Melo by the ears and by the neck, twisting his neck, pulling him off, trying to." (*Id.*, Ex. 12 at 132.) After telling Matheney to stop fighting the dog, Mathis ordered the dog to release Matheney's leg. Mathis testified that, at this point, Matheney was on the ground.

CPD Officers Josh Ward and Brandon Tayes arrived and attempted to secure Matheney's left and right hands, respectively. The officers claim that Matheney was moving his arms, making it difficult to handcuff him. Mathis testified that he could see Matheney "continuously with his arms, every time Officer Ward gets his arm or Officer [Tayes], he is jerking that arm away and flailing around." (*Id.* at 140.) Ward testified that, when he arrived, Matheney was on the ground, "looking around moving his arms." (*Id.*, Ex. 14 at 33.) Ward testified that Matheney's arms were "[f]lailing. And when I first arrived he tucked them under his chest." (*Id.* at 35.)

>Ward elaborated:
>
>>[Matheney] would try to push off the ground, reach under his body and also reach beyond me to a stack of garbage. I didn't know if he was trying to reach for a weapon, didn't know if he had a weapon. You couldn't see in the junkyard. It was very dark. . . .
>>
>>Officer Tayes is on the other side trying to gain control of [Matheney's] right arm. And he is pulling away from my grasp flailing around. . . .
>>
>>I was unable to gain control of Mr. Matheney's hand and place him into custody.

(*Id.* at 36-37.)

Officer Anthony Reep arrived with, or shortly after, Ward and Tayes. At his deposition, Reep described the situation:

3

> I ran up. Officer Mathis had Melo pulled back away from Mr. Matheney. I'm pretty sure he said somebody get him cuffed. Officer Ward moved – there was a lot of debris. It was really dark. And he moved to the left shoulder of Mr. Matheney. Started telling him to put his hands behind his back. And [Ward] was trying to pull [Matheney's] hands behind his back and put handcuffs on him. And every time Mr. Matheney would yank his hands away, twist them and try to tuck them underneath his chest. And also worked at trying to pull his hands back out. And he kept moving his hands. And [Matheney] was saying, I give, I give while he was actively resisting and fighting against Officer Ward from pulling his hands behind his back.

(*Id.*, Ex. 13 at 39-40.)

Ward testified that he used his knee to strike Matheney's side twice in an effort to bring his arm under control. Reep testified that, after one of the knee strikes, Matheney "continued to wrestle with his arm." Reep stated that he had a taser, and, as Ward continued trying to control Matheney's arm, Reep deployed the taser. (*Id.* at 40.) The taser initially "didn't connect" to Matheney, but it did connect on Reep's second attempt. (*Id.* at 40-41.) The two- or three-second taser shock did not stop Matheney's resistance, however, and Reep testified that the officers "continue[d] trying to pull his hands behind his back and he continued to fight." (*Id.* at 41.)

Eventually, the officers handcuffed Matheney and walked him back to the police car. Although an officer threatened to "drag [Matheney's] ass" through the junkyard if he did not walk, (*id.*, Ex. 6), Matheney does not allege that he was abused by the officers from that point forward. After the arrest, Matheney was taken to the hospital, where he was treated for lacerations to his leg and other injuries.

Matheney, not surprisingly, tells a different version of events, in which he fought neither the dog nor the officers. Instead, Matheney testified, he was trying to surrender: "I wasn't

4

fighting the dog, I was wanting to get it off me." (*Id.*, Ex. 11 at 193.) Matheney initially testified that he did not hear the officers say "get your hands behind your back," because he "wasn't hearing that. I was hearing that dog." (*Id.* at 194.)

Matheney further testified that, "when the dog was on me and they tased me and everything else, it was hard to do anything." (*Id.* at 195.) "I wasn't resisting [the officers], though. I was just – it was an awkward position. I wasn't fighting." (Docket No. 61, Ex. 5 at 263.) According to Matheney, the dog was still biting him when he was tased, which caused the dog to bite his leg even harder.

To corroborate his testimony, the plaintiff has submitted an affidavit from Terry Barbour, who lives in or near the junkyard. The affidavit states that Barbour saw Matheney on the ground being bitten by the police dog and that "[o]ne police officer was sitting on [Matheney's] chest and another was holding his feet." (*Id.*, Ex. 10 at 1.) Barbour claims that Matheney's arms were at his side and that he was not fighting the officers.

The defendants have submitted a time-stamped recording from the camera in Mathis' police car. (*See* Docket No. 41; Docket No. 36, Ex. 6.) Although the video does not show the arrest, the camera did record audio of the struggle between Matheney and the officers. The incident begins at the time stamp of 22:16:10, when Mathis stopped his car at the junkyard. The court's review of the video reveals that the timeline of the incident was as follows:

> 22:16:10 – Mathis arrives at the junkyard.
>
> 22:16:34 – According to Mathis' testimony, Mathis deploys the police dog. (Docket No. 36, Ex. 12 at 129.)

5

22:16:35 – Officers audibly say "Show us your hands."[2]

22:16:48 - 22:16:55 – Mathis audibly tells Matheney several times to stop fighting the dog.

22:16:57 – According to Mathis' testimony, he commands the dog to release Matheney. (*Id.* at 133.)

22:16:58 - 22:17:31 – Officers audibly and repeatedly tell Matheney to place his hands behind his back.

22:17:32 – Reep audibly deploys the taser, after which the shouting and struggling continue.

22:18:18 – An officer audibly says, "Everybody calm down."

22:18:30 – Officers audibly tell Matheney to walk from the junkyard to the police car.

Thus, the entire incident, from Mathis' arrival at the junkyard to the time Matheney was handcuffed, took place in less than two-and-one-half minutes. Approximately 40 seconds elapsed between the time Mathis commanded Matheney to stop fighting the dog and the time Reep tased Matheney. Less than one minute elapsed between the tasing and the walk back to the police car.

Matheney was indicted for, among other things, resisting arrest, evading arrest, reckless endangerment, and violating implied consent by refusing an alcohol test. He pleaded guilty to each of these four charges and served a 90-day jail sentence.

---

[2] Mathis testified that he followed the dog for at least ten seconds, never falling more than ten yards behind. (Docket No. 36, Ex. 12 at 130.) The plaintiff points out that Mathis' testimony that he released the dog at 22:16:34 is inconsistent with officers saying "Show us your hands" just one second later, at 22:16:35, because officers would not have yet located Matheney. Assuming that the plaintiff is correct, this only means that the dog was released several seconds earlier than Matheney's testimony indicates.

6

The First Amended Complaint, although not a model of pleading clarity, asserts state-law claims for assault, battery, and negligence, and a 42 U.S.C. § 1983 claim for excessive force in violation of the plaintiff's rights under the Fourth and Fourteenth Amendments. (Docket No. 35 ¶¶ 17-22.)

## ANALYSIS

The defendants have filed Motions for Summary Judgment pursuant to Federal Rule of Civil Procedure 56, arguing that all of Matheney's claims should be dismissed.

### I. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) requires the court to grant a motion for summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the [plaintiff]." *Moldowan*, 578 F.3d at 374.

"'[T]he judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "the mere existence of a scintilla of

7

Case 2:08-cv-00066   Document 72   Filed 04/07/10   Page 7 of 16 PageID #: 1477

evidence in support of the plaintiff's position will be insufficient," and the plaintiff's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the plaintiff. *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II.     Application of the *Heck* Doctrine

The defendants argue that recovery under 42 U.S.C. § 1983 is precluded because Matheney pleaded guilty to resisting arrest. (Docket No. 38 at 8-14; Docket No. 54 at 6-7.)

In *Heck v. Humphrey*, 512 U.S. 477 (1994), the Supreme Court held that a plaintiff cannot recover under § 1983 when the basis for the claim necessarily implies the invalidity of a previous state-court criminal conviction. *Id.* at 486-87. As an example, the Court explained that a criminal defendant who is convicted of resisting arrest, "defined as intentionally preventing a peace officer from effecting a *lawful* arrest," cannot later bring a § 1983 action alleging that the arresting officer violated the Fourth Amendment. *Id.* at 487 n.6. Any recovery would necessarily mean that the arrest was not lawful, which would negate an element of the resisting arrest conviction. *Id.*

Under Tennessee law, the crime of resisting arrest involves obstructing an officer "from effecting [an] . . . arrest . . . by using force against the law enforcement officer." Tenn. Code Ann. § 39-16-602(a). Excessive or unreasonable force by the police officer is an affirmative defense to a charge of resisting arrest. *Roberts v. Anderson*, 213 Fed. Appx. 420, 427 (6th Cir. 2007) (citing Tenn. Code Ann. §§ 39-16-602, 39-11-611(e)(1)-(2)). This means that "a guilty plea and resultant conviction of such a charge necessarily includes a finding that the officer did

8

not use excessive force." *Id.*

Thus, *Heck* applies to bar a § 1983 claim if a struggle between a plaintiff and police officers gives rise to both the plaintiff's resisting arrest conviction and the plaintiff's excessive force claim, "and the two are inextricably intertwined." *Cummings v. City of Akron*, 418 F.3d 676, 682-82 (6th Cir. 2005). In contrast, the claim is not barred if the alleged excessive force occurred *after* the suspect was handcuffed and brought under control. *Coble v. City of White House, Tennessee*, No. 3:08-0314, 2009 U.S. Dist. LEXIS 78633, at *21 (M.D. Tenn. Aug. 29, 2009). In that case, the excessive force could not have operated as a defense to the resisting arrest charge, and the § 1983 claim does not necessarily imply the invalidity of the conviction.

Here, the court finds that Matheney's conviction for resisting arrest and his claim for excessive force against Mathis, Ward, and Reep are inextricably intertwined. The plaintiff's guilty plea serves as an admission that he did, at some point during the arrest, physically resist the officers or the police dog. This resistance could only have occurred after the dog found and bit Matheney.[3] A struggle between the plaintiff and the officers ensued, taking place over the course of approximately 90 seconds. The audio recording reveals that Matheney and the officers struggled continuously with each other for that entire time. Matheney was not yet handcuffed, and the officers repeatedly commanded him to place his hands behind his back. Because the conviction and the civil claim both arise from a single, continuous struggle, the court concludes

---

[3] This is significant because the plaintiff's claims focus largely on the defendants' use of the police dog and the injuries that the dog inflicted on the plaintiff. But the dog bite necessarily occurred before, or at least concurrently with, the plaintiff's efforts to resist arrest. It is beyond question, then, that the plaintiff could have raised the dog's excessive force as a defense to the charge of resisting arrest. Because he did not, *Heck* bars recovery for the dog-related injuries.

9

that they are inextricably intertwined.

This is similar to *Coble*, in which the plaintiff, Coble, suffered a broken leg during an arrest. Because the plaintiff had pleaded guilty to resisting arrest, the court found that *Heck* barred his excessive force claim:

> The audio recording reveals that Officer Carney commanded Coble four times to put his hands behind his back and twice to "let go of your hand." In light of Coble's admission that he resisted, one could only conclude from listening to the audio recording that the physical struggle for control between Officer Carney and Coble continued after Coble hit the ground. Once the handcuffs were placed on Coble's wrists, there was no further scuffling, and Coble admitted as much.
>
> In light of this evidence, the Court concludes that Officer Carney's use of force to bring Coble under control and handcuff him was inextricably intertwined with Coble's resistance to arrest.

*Coble*, 2009 U.S. Dist. LEXIS 78633 at *22-23.

The plaintiff, citing several non-binding cases from other circuits,[4] argues that the excessive force took place after the police had already brought him under control. (Docket No.

---

[4] This is curious, because there are numerous Sixth Circuit and Tennessee federal district court cases that interpret and apply *Heck*. *See, e.g.*, *Roberts*, 213 Fed. Appx. 420 (applying *Heck* to bar the plaintiff's excessive force claim); *Cummings*, 418 F.3d 676 (same); *Dubose v. City of Morristown*, No. 2:07-CV-115, 2009 U.S. Dist. LEXIS 53477 (E.D. Tenn. June 22, 2009) (same); *Anderson v. Hamblen County*, No. 2:05-CV-213, 2008 U.S. Dist. LEXIS 13916 (E.D. Tenn. Feb. 25, 2008) (same); *Lowe v. Henson*, No. 3:05-cv-275, 2007 U.S. Dist. LEXIS 50563 (E.D. Tenn. July 11, 2007) (same); *Jones v. Claiborne County*, No. 3:05-CV-580, 2007 U.S. Dist. LEXIS 29073 (E.D. Tenn. Apr. 18, 2007) (same); *Cook v. McPherson*, No. 1:05-cv-136, 2007 U.S. Dist. LEXIS 24110 (E.D. Tenn. Mar. 30, 2007) (same); *Warner v. McMinn County*, No. 1:04-CV-399, 2007 U.S. Dist. LEXIS 79024 (E.D. Tenn. Oct. 11, 2007) (holding that the claim was not barred because the alleged force occurred after the plaintiff was handcuffed); *Stone v. Watkins*, No. 1:04-cv-259, 2007 U.S. Dist. LEXIS 24027 (E.D. Tenn. Mar. 30, 2007) (same).

61 at 13-17 (citing *Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005); *Hardrick v. City of Bolingbrook*, 522 F.3d 758 (7th Cir. 2008).) But in *City of Hemet*, the plaintiff had pleaded guilty to violating a California statute that forbids the delay or obstruction of an arrest, and he had committed several violations even before the officers used force against him. 394 F.3d at 696-97. Similarly, in *Hardrick*, the plaintiff had violated an Illinois statute simply by fleeing from officers, who later broke the plaintiff's wrists while handcuffing him.[5] 522 F.3d at 764 n.2.

In contrast, Matheney's violation of Tenn. Code Ann. § 39-16-602 could not possibly have occurred before the commencement of his struggle with the officers. Furthermore, there is no evidence or allegation that the officers used improper force on Matheney after he was handcuffed. *Cf. Warner v. McMinn County*, No. 1:04-CV-399, 2007 U.S. Dist. LEXIS 79024, at *4, 31 (E.D. Tenn. Oct. 11, 2007) (declining to dismiss the plaintiff's claim because he was "placed in a headlock by [the officer] who began hitting him with his fists, and sprayed by [the officer] with a chemical weapon *despite already being handcuffed*") (emphasis added). The audio recording shows that the struggle between Matheney and the officers ceased by the time the officers began walking him back to the police car.

The plaintiff testified that he never physically resisted the officers, and Barbour's affidavit states that Matheney kept his hands by his side during the arrest. But these statements are impossible to reconcile with the fact that Matheney pleaded guilty to resisting arrest. Having

---

[5] In each of the two other cases cited by Matheney, the plaintiff was convicted of assault, not resisting arrest, and the officer's excessive force was not a defense to the assault charge. *Ballard v. Burton*, 444 F.3d 391, 401 (5th Cir. 2006) (applying Mississippi law); *Green v. N.J. State Police*, 246 Fed. Appx. 158, 162 n.8 (3d Cir. 2007) (applying New Jersey law). Because excessive force is a defense to resisting arrest in Tennessee, these cases are inapposite.

11

already admitted his guilt, Matheney cannot now profess innocence and collaterally attack his plea and conviction. *See Heck*, 512 U.S. at 484-85. The plaintiff could have raised the officers' alleged excessive force as a defense to the criminal charge, but he chose not to. This prevents him from subsequently recovering for the officers' excessive force.

Accordingly, the court will dismiss the plaintiff's § 1983 claim.[6]

### III. Matheney's Guilty Plea

The plaintiff argues that, when he pleaded guilty to resisting arrest, he thought that the charge arose only from his efforts to run from the police. In other words, the plaintiff claims that he did not knowingly plead guilty to using force to resist the arresting officers when they were attempting to handcuff him. He further claims that "the record is . . . not clear as to specifically which facts were involved in Harold Matheney's plea of guilty to resisting arrest." (Docket No. 61 at 5.) Thus, he argues, his § 1983 claim does not necessarily contradict his guilty plea.

First, the plaintiff's supposed confusion over the distinction between evading and resisting arrest is made less plausible by the fact that he was separately charged with, and pleaded guilty to, evading arrest.

Second, the record shows that Matheney knew that he was pleading guilty to forcibly resisting arrest. The indictment charges that Matheney "did unlawfully and intentionally prevent or obstruct Officer Chase Mathis, known to him to be a law enforcement officer, from effecting a stop, frisk, halt, arrest, or search, *by using force against the law enforcement officer*, in violation

---

[6] Because *Heck* applies to bar the plaintiff's claim, the court does not need to analyze the parties' arguments regarding qualified immunity.

12

of T.C.A. § 39-16-602." (Docket No. 71, Ex. 2 at 7 (emphasis added).) The plea form that Matheney signed states: "I have received and read a copy of the indictment and discussed it with my attorney. My attorney has informed me as to the nature of the charges against me and I understand the nature of the charges." (Docket No. 36, Ex. 1 at 1.) Similarly, Mathis' affidavit of complaint, which was attached to the arrest warrant for the resisting arrest charge, states: "After the dog was taken away the defendant continued to resist the officers struggling and refusing to obey their commands. Because of the resistance officers were forced to deploy a taser to subdue the defendant and finally get him handcuffed and into custody." (Docket No. 67, Ex. 2.)

Third, the charges against Matheney were explained during his plea hearing. Mark Tribble, the Assistant District Attorney General, described the allegations underlying the indictment:

> Gen. Tribble: . . . At the end of the vehicle pursuit, Mr. Matheney stopped his vehicle, got out on foot and ran from the police officers, was subdued with the assistance of a canine, *and resisted physical restraint from the officers* at the scene of the accident. . . .
>
> The Court: Mr. Matheney, you heard what Gen. Tribble said about the facts in this case. Do you have any dispute with those allegations?
>
> The Defendant: No, sir.

(*Id.*, Ex. 1 at 4-5 (emphasis added).)

The court itself then discussed the elements of the charges to which Matheney was pleading guilty:

> The Court: Evading arrest is knowingly evading or fleeing from a

13

> person you knew to be an officer who was attempting to make an arrest . . . . Does that make sense to you, Mr. Matheney?
>
> The Defendant: Yes.
>
> The Court: Resisting arrest, again, *is with force knowingly resisting* a person you knew to be a law enforcement officer who is attempting to make an arrest. . . . So, do you understand those elements then that the state would have to prove in this case to a jury, Mr. Matheney?
>
> The Defendant: Yes, sir.
>
> The Court: And have you discussed those charges with your attorney?
>
> The Defendant: Yes, sir.

(*Id.* at 10-11 (emphasis added).)

Finally, the plaintiff's own deposition testimony reveals that he understands that the crime of resisting arrest involves some sort of physical resistance:

> Q. . . . What is resisting arrest?
>
> A. I would say trying to struggle or fight back or something but I didn't do that.
>
> Q. You pled guilty to it, didn't you?
>
> A. I pled guilty to a lot of things I didn't do.
>
> Q. And why is that? Why is that, Mr. Matheney?
>
> A. Some of it was to help her out.[7]

---

[7] "Her" presumably refers to the daughter of Matheney's girlfriend. She was one of the people who fled from Matheney's truck on July 17, 2007 when the police initially approached. (Docket No. 36, Ex. 11 at 145.)

14

(Docket No. 61, Ex. 19 at 105.)

It is clear that the plaintiff knew that he was pleading guilty to a crime that involved using force against arresting officers. The plaintiff cannot escape the application of *Heck* by now claiming that he did not understand the charges against him.

The court notes, however, that the indictment only mentions resistance against Mathis, who is named as "the arresting officer" – it does not explicitly mention resistance against the dog or the other officers. (*See* Docket No. 71, Ex. 2 at 7.) The plaintiff correctly points out that there is no evidence that Matheney ever touched Mathis. He asks the court to dismiss the § 1983 without prejudice so that he may "go back to Putnam County Criminal Court and do a Habeas Corpus to set this plea aside," apparently on the ground that the indictment was defective. (Docket No. 61 at 13.)

This does not appear to be a promising avenue for the plaintiff. Nevertheless, the court will dismiss the § 1983 claim without prejudice, so that the plaintiff may re-file the claim if he is ultimately successful in setting aside his conviction.

## IV.    Remaining State Court Claims

Because the plaintiff's only federal-law claim has been dismissed, the court will decline to exercise supplemental jurisdiction over the remaining state-law claims for assault, battery, and negligence. *See* 28 U.S.C. § 1367(c)(3). It is common for courts to decline supplemental jurisdiction after dismissing a *Heck*-barred § 1983 claim. *See, e.g.*, *Coble,* 2009 U.S. Dist. LEXIS 78633 at *40-41; *Cook v. McPherson*, No. 1:05-cv-136, 2007 U.S. Dist. LEXIS 24110, at *18 (E.D. Tenn. Mar. 30, 2007); *Lowe v. Henson*, No. 3:05-cv-275, 2007 U.S. Dist. LEXIS

15

50563, at *24 (E.D. Tenn. July 11, 2007).  The court will dismiss these claims without prejudice.

## **CONCLUSION**

For all of the reasons discussed above, the court will grant the defendants' Motions for Summary Judgment.  The court will dismiss the § 1983 excessive force claim without prejudice, and the plaintiff may re-file it if he is successful in setting aside his state-court conviction.  The court will also dismiss the assault, battery, and negligence claims without prejudice, and the plaintiff may re-file them in the proper state court.

An appropriate order will enter.

                                                                                       _____
                                                                                       ALETA A. TRAUGER
                                                                                       United States District Judge

16